## Case No. 17,710.

### The WILLIAMS.

[Brown, Adm. 208; [1] 7 Am. Law Rev. 755.]

Circuit Court, E. D. Michigan. March, 1873.

JURISDICTION—EXECUTORY MARITIME CONTRACT— LIEN—EFFECT OF PART PERFORMANCE.

1. A tug was hired at $200 per day to go to the assistance of a vessel which had been reported aground on the shore of Lake Huron. On arriving at the spot, it was found the vessel had been gotten off, and the tug returned home without rendering her any actual assistance. *Held*, a proceeding in rem would lie to recover the stipulated compensation.

[Cited in Scott v. The Ira Chaffee, 2 Fed. 402.]

2. All maritime contracts made by the master, within the scope of his authority as master under the maritime law, per se hypothecate the ship, and performance, in whole or in part, does not affect the question of jurisdiction generally, or the character of the proceeding, whether in rem or in personam.

[Cited in The Dolphin, Case No. 3,973; The Senator, 21 Fed. 191; The St. Joseph, Case No. 12,230; Roberts v. The Windermere, 2 Fed. 727; Robinson, McLeod & Co. v. Memphis & C. R. Co., 9 Fed. 140; Insurance Co. of Pennsylvania v. Proceeds of The Waubaushene, 24 Fed. 559; The Maiden City, 33 Fed. 717; The Gilbert Knapp, 37 Fed. 213; The Roanoke, 50 Fed. 577.]

3. A libel in rem for salvage services will be sustained, though the contract was for a per diem compensation, not contingent upon success.

[Cited in The New Orleans, 23 Fed. 911.]

4. The nature of maritime liens discussed, and the authorities reviewed.

[Cited in The Illinois, Case No. 7,005.]

[Appeal from the district court of the United States for the Eastern district of Michigan.]

The libellant, John Demas, owner of the tug U. S. Grant, claimed a lien upon the brig Williams, under the following state of facts: On the 4th day of June, 1871, the brig was aground at Bing Inlet, on the Canadian shore of Lake Huron. On that day the master of the brig employed the tug at Detroit, her home port, to go to the brig's rescue, under a special contract to pay her $200 per day, from the time she should leave Detroit till her return, and $200 additional for use of hawser; which compensation was to be paid at all events, whether the services of the tug should result in, or contribute to getting the brig off or not. The tug left immediately to enter upon the service, but in approaching the place where the vessel had been, and probably was at the time of the agreement, aground, it was found that she was already afloat, and the services of the tug had become unnecessary. Thereupon the tug returned to Detroit. She was absent a lit-

tle over five days, and the gross amount of her compensation was settled by the master at $1,100, for which a draft was given. The draft having been protested for non-payment. this suit was brought, and the draft tendered to be delivered up.

The following opinion was delivered by the district court (LONGYEAR, District Judge):

That the contract was maritime in its character, and that the claim for compensation under it would constitute a valid cause of action in admiralty, in personam, is not seriously disputed, and I think does not admit of doubt. The question is, has the libellant a lien upon the vessel? If, by operation of law, the contract itself raises a lien, then the present action in rem will lie, and the lien must be enforced, notwithstanding the ultimate object and purpose of the contract became unnecessary, or for any purpose impossible of performance, libellant having performed on his part so far as he could. If, however, no lien was created by the contract, then, as no service to the vessel was actually rendered, it is difficult to see how, or on what principle, a lien has arisen. Was a lien created by the contract? I think not. The service contracted to be rendered—that is, the ultimate object and purpose of the contract—was purely a salvage service. A lien on account of a salvage service arises because, and only because, something is saved by the service, or that service has contributed towards saving something, and then only upon what has been so saved. These constitute the very essence of a lien for salvage. A lien then arises out of, and exists only on account of, the fact of salvage, and not on account of any contract under which the service may be rendered. When the service is rendered under contract, the contract is resorted to for the purpose of fixing the compensation, and not for the purpose of creating a lien. The law settles the question of lien in all cases of salvage where the contract is silent upon the question, and is not of such a character as to preclude a lien which might otherwise exist. Where a salvage service is actually rendered in a case like the present, there is no doubt the lien thereby created extends to the entire time employed, including going and returning. The Independence [Case No. 7,014]. But this is because the time spent in going and returning is incidental to the salvage. If the salvage fails, or is wanting. of course the lien and all its incidents fail. The Narragansett [Id. 10,020].

There is much force in the analogy suggested by counsel between the present case and the case of an executory contract of affreightment. In such cases a lien arises and can exist only with the actual delivery of the freight on board, or what is in law equivalent to such delivery. Now. suppose a vessel is employed at Detroit to go to Cleveland or other port, for some specific cargo which is there and ready for shipment. for a fixed per diem compensation for the entire service, including going and

[1] [Reported by Hon. Henry B. Brown, District Judge, and here reprinted by permission.]

returning. The vessel actually enters upon the performance of the contract on its part, by going to Cleveland, or other port, where the cargo was when the contract was made and when its performance was so entered upon, and there finds that the cargo has already gone forward, or for some reason its transportation has become unnecessary or impossible, and the vessel returns to Detroit. While there is no doubt an action in personam would lie for the time spent, no one would contend for a moment that a lien on the goods for freight was thereby created. It seems to me the case supposed and the one under consideration are quite analogous.

If necessary, this case might be disposed of adversely to the libellant, on another ground, and that is, the contract being for a fixed price, to be paid at all events and in no manner dependent on success (the contract being for a salvage service), no lien upon the vessel could result in any event. This court, at the November term, 1871, so decided in the case of The Marquette [Id. 9,101]. See, also, the following cases: The Whitaker [Id. 17,524], and the same case [Id. 17.525]; The Independence [supra]; Squire v. One Hundred Tons of Iron [Case No. 13,270]; The Camanche, 8 Wall. [75 U. S.] 477. But inasmuch as under the view already taken, it is unnecessary to a decision, I do not put the case upon that ground. The learned advocate for libellant, seeing the difficulties in the way of maintaining a lien for salvage, asked and obtained leave at the hearing to amend his libel by striking out "salvage" as the cause of action, and inserting in lieu thereof, "contract, civil and maritime." I fail to see, however, that this improves the matter in the least. In fact, as it seems to the court, the concession admits the case against the libellant on the question of lien. The contract was for the performance of a salvage service, and if a lien cannot be maintained on that ground (and we have seen it cannot), it cannot be maintained on any other. In order to do so, the court would have to construe the contract to mean something different from its express terms, and thus make a new contract for the parties, which, of course, will not be done. The libel must be dismissed, with costs to the respondent; but inasmuch as the point upon which the decision is based, was clearly presented on the face of the libel, and therefore might and ought to have been raised by exception, all costs of witnesses and taking testimony must be omitted in the taxation. The decree must be without prejudice to such other action as libellant may see fit to bring for the recovery of his claim.

An appeal was taken by the libellant from this decree.

Mr. H. B. Brown, for libellant and appellant.

Objection is made to a recovery upon the sole ground that although the tug entered upon the performance of her contract, and proceeded to the place where the vessel was lying, she did not actually take her line or pull her off. It is conceded that if she had actually pulled the vessel off, she would be entitled to recover not only for this service but for going and returning for that purpose. It is also conceded that if the tug had taken her line and made an effort in good faith to pull her off, she could have recovered though that effort was entirely futile. There seems to be, therefore, in the opinion of claimant, some magic about the physical connection between the tug and the vessel that gives the lien. It is unnecessary to consider whether a proceeding in admiralty can be maintained for the breach of a purely executory contract. All we claim in this case is that where a vessel has once entered upon the performance of a maritime contract, she is entitled to recover for the services actually rendered, though they were of no benefit to the vessel. The general rule is well settled that wherever in a maritime contract there is a remedy against the owner, there is also a lien upon the vessel. The Druid, 1 W. Rob. Adm. 399; The Bold Buccleugh, 2 Eng. Law & Eq. 536; The Freeman, 18 How. [59 U. S.] 182. All contracts of the master within the scope of his authority, give a lien. 1 Pars. Shipp. 173, note; 2 Pars. Shipp. 178, note 5; The Paragon [Case No. 10,708]. It is held that although a ship has no lien upon the cargo before it is received, the lien attaches the moment it is shipped on board, and she cannot be compelled to give it up until the freight is paid. 1 Pars. Shipp. 175; Bulkley v. Naumkeag Steam Cotton Co., 24 How. [65 U. S.] 386; The Hermitage [Case No. 6,410]; The General Sheridan [Id. 5,319]; The Pacific [Id. 10,643]. There is no difference in principle whether the tug takes the vessel's line or not. She may not render her a particle of service, and may even injure the vessel, and yet it is not denied she would have a lien. The following cases dispose of the question of the necessity of physical connection with the vessel to confer a lien: The Pacific [supra], where an action in rem was sustained for the breach of an executory contract to carry a passenger. Bulkley v. Naumkeag Steam Cotton Co., 24 How. [65 U. S.] 386, in which a vessel was held liable for the loss of a cargo after it was delivered to a lighter, but before it was shipped on the vessel. See remarks as to physical connection, page 393. The rule is well settled that if supplies are bought for a vessel upon the representation they are necessary, the vessel is held, though in fact they are not necessary, and though they were never placed on board at all. The Gustavia [Case No. 5,870]; Bryan v. Pride of the West, 12 Mo. 371; Gibbons v. The Fanny Barker, 40 Mo. 253; Merritt v. Brewer [Case No. 9,483]; The Kearsarge [Id. 7,634]; Brightley, Fed. Dig. p. 799, § 500; Sewall v. Hull of New Ship [Case No. 12,682]; The Walkyrien [Id. 17,091]. In the case of The Canada [Id. 219],

salvage was awarded for consorting an injured vessel, though she was not touched by the consort; and, in The Underwriter [Id. 14,341], it was given to a vessel which "lay to" near a vessel in distress, though no assistance was actually rendered. The question involved in this case is also discussed in The Susan [Id. 13,630], and an opinion expressed in favor of a lien. See 2 Pars. Shipp. p. 287, 144. In the following cases actions were maintained, based upon a simple tender of services: The America [Case No. 289]; Ex parte McNeil, 13 Wall. [80 U. S.] 236. It is unnecessary to determine whether a lien is created by the contract. There are a few cases which indicate that an action in rem will not lie for the breach of a purely executory contract, but on examination they will be found confined to preliminary contracts or to contracts of affreightment in which the lien is in the nature of a common-law lien, and dependent upon possession. Andrews v. Essex Ins. Co. [Case No. 374]; The Tribune [Id. 14,171]; The S. C. Ives [Id. 7,958]; The General Sheridan [supra]. There are dicta to the same effect in the following cases: The Freeman, 18 How. [59 U. S.] 182; Vandewater v. Mills, 19 How. [60 U. S.] 82. In The City of London, 1 W. Rob. Adm. 89, a mariner was discharged after the articles had been signed, but before the commencement of the voyage, held, that as the voyage had been performed he could sue in admiralty for his wages. As nothing remained to be done in this case except payment of the money, the contract was clearly executed. 2 Greenl. Ev. 104.

W. A. Moore, for claimant and appellee.

The contract was a personal one, and created no lien upon the vessel. A maritime lien is a jus in re. The Globe [Case No. 5,483]; The Young Mechanic [Id. 18,180]: The Kimball, 3 Wall. [70 U. S.] 37. To create a lien for supplies, there must be a necessity for supplies and a necessity for credit. Pratt v. Reed, 19 How. [60 U. S.] 359; Tod v. Sultana, Id. 362. A contract to take care of a ship in port and the performance of the service does not create a lien. Levering v. Bank of Columbia [Case No. 8,286]; Phillips v. The Thomas Scattergood [Id. 11,106]; Gurney v. Crockett [Id. 5,874]. There is no lien for a stevedore's services. The Anstel [Id. 339]; The D. C. Salisbury [Id. 3, 694]. The master has no lien for his wages. The Grand Turk [Id. 5,683]; The Orleans v. Phoebus, 11 Pet. [36 U. S.] 175. The language used in The Druid and The Bold Buccleugh is not approved in the case of The Freeman. In the case of The Druid the question was whether the owners were responsible for damage willfully done by the master when not acting within the scope of his authority. In The Bold Buccleugh, the question arose whether the pendency of a common law action, for a collision, could be pleaded in abatement of a suit in admiralty in rem for the same collision.

The case of The Pacific [supra] was decided by Judge Nelson in 1850; the case of Vandewater v. Mills [supra], decided in 1856, overruled The Pacific, and Judge Nelson himself recognized this fact in the case of The Hermitage [supra]. And so Judge Blatchford held in the case of The General Sheridan. In The Lady Franklin, 8 Wall. [75 U. S.] 325, the supreme court adheres to the principle that the vessel is not bound except where the cargo is shipped. The cases cited by libellant, where the vessel was held for supplies "furnished" for her, but not delivered to her, were all dependent upon a state statute, except Merritt v. Brewer [supra]. A maritime contract does not necessarily include a maritime lien. The Kiersage [Case No. 7,762]; Vandewater v. Mills, 19 How. [60 U. S.] 82, 89, 90, 91.

EMMONS, Circuit Judge. Having recently, before the argument in this cause, decided in the case of the steamer Robinson, in the Western district of Tennessee, substantially the principle here involved, we should not, but for the history of the cause, have deemed the question one of doubt. Without any very thorough examination at the time, but drawing mainly upon what we had ever assumed to be the law, we ruled that all maritime contracts made within the scope of the master's usual authority did per se hypothecate the ship; and that those of affreightment, insurance, towage, the fitting out and discharge of vessels, and for aiding them in distress, were instances only of the application of the rule. After such examination as the great pressure upon our time will permit, we see no reason to modify this ruling; but hold that the contract in this case did ex vigore, the instant it was consummated, pledge both vessels, that which was to aid and that to be aided, for the security of the agreement. Performance in whole or in part works no consequence in reference to jurisdiction generally, or in the character of the remedy, whether in rem or in personam. It affects only the measure of recovery.

The practical importance of this question to our northwestern commerce; the numerous analogous rights which will fail of protection by even a limited application of the contrary doctrine; the protective power which the jurisdiction we sustain will exert in preventing the disregard of agreements; and the fear that a brief unreasoned judgment may be less influential to extend and support it, is our excuse for pursuing somewhat at length the reasons for our ruling, although forced to do so with much want of form. That contracts for salvage, towage and of affreightment, are in the most unqualified sense maritime, and therefore of admiralty cognizance, will not be questioned; and that New Jersey Co. v. The Merchants' Bank, 6 How. [47 U. S.] 344, Morewood v. Enequist, 23 How. [64 U. S.] 493, Insurance

Co. v. Dunham, 11 Wall. [78 U. S.] 1, and the authors and judgments they refer to, bring within the rule the contract in this case, will be as readily conceded. The denial extends only to the remedy in rem. We infer that one of the reasons for the decree of the district court is that this is at least in the nature of salvage service, and as the libellant did not by his efforts save anything, there is no remedy in rem. The Camanche, 8 Wall. [75 U. S.] 477; 2 Pars. Adm. 283, and cases cited; Ben. Adm. §§ 300–300e; The Henry Ewbank [Case No. 6,376]; Clarke v. The Dodge Healy [Case No. 2,849]; 1 Newb. Adm. 428, 438; 1 Conk. Adm. 352, which say that salvage is earned not by an attempt but by actual rescue, assert no doctrine having any tendency to inhibit this proceeding. They and the numerous kindred judgments and authors deny only the extraordinary compensation given for salvage service. There is no intimation that a remedy against the ship, if it is saved, will be denied if the agreement was for payment absolutely. The same remark is equally true of all the cases and authors which say if the agreement is for such absolute payment, irrespective of results, there can be no reward for salvage properly so called. They all relate to compensation only, but not in any case to a denial of the proceeding in rem. Thus, the Case of One Hundred Tons of Iron [supra], is understood by counsel to deny all remedy against the ship. As the sole authority for what it does in this regard decide, The Independence [supra] is cited, in which, after a careful discussion of this question, Judge Curtis takes pains to say he does not decide that in a case like that now before us there is no jurisdiction in rem. On the contrary, with manifest approbation, he refers to the judgment of Judge Conkling in The A. D. Patchin [Case No. 87], affirmed on appeal by Judge Nelson, in which there was a contract precisely like that here set up, to labor for the rescue of the ship for a per diem compensation, and where both judges sustained a proceeding in rem, as consistent with the other wholly distinct rule that there can be no extraordinary compensation in such case. It is said: "For all maritime contracts which the master is authorized to make, there is an implied hypothecation of the ship. There was authority to employ others to aid in preserving the ship, and I imagine that such a contract, subject to the revisory powers of the court, would create a lien on the vessel." The Emulous [Id. 4,480], The Centurion [Id. 2,554], The Pigs of Copper [Id. 1,193], are reviewed, and the principle deduced that suits for salvage may be maintained, although there is an agreement for a fixed and absolute compensation. This judgment is referred to in this connection more particularly to illustrate the position that a denial of salvage is not a rejection of a proceeding in rem, but it quite as fully sustains the broader proposition soon

to be considered, that all authorized maritime contracts pledge the vessel for their performance.

It will be noticed the term salvage is used to denote the nature of the service, even where an absolute compensation is agreed on. And so are other cases. In Hennessey v. The Versailles [Case No. 6,365], Judge Curtis remarks that he doubts whether there is any such head, properly speaking, as towage. It should all, he thinks, be termed salvage, whether the ship is in distress or not, whether there is an agreed price or for fixed wages, as in the case before us. It is, however, but a name. He followed only what Judge Story a little less plainly said in The Emulous [supra], where he was seeking to lodge the power under some well-known head and among the old, familiar classes of admiralty jurisdiction, that it might escape the contests in the supreme court. That high tribunal has now settled this and some other questions, fortunately for the commerce of the country, and declared that over all maritime contracts our courts have cognizance, and that our only duty is to determine they are such. We need not now, in order to take jurisdiction, maintain that the towage of a staunch and seaworthy ship through the safe and land-locked straits of Detroit is a salvage service. We believe that the partial adoption of this inapplicable nomenclature is the parent of the objection in this case. It illustrates the impolicy of applying names to things and acts in unusual senses. Towage, however, is generally called towage, and jurisdiction over it taken not because it is salvage or in the nature of salvage, but because it is performed in pursuance of a maritime contract over which the constitution and laws give the district courts jurisdiction. In most such cases the more appropriate, but, in our opinion, unnecessary terms of ordinary and "extraordinary towage" are employed. See The Princess Alice, 3 W. Rob. Adm. 138; The Kilby, 26 Eng. Law & Eq. 596, note 1; The Kingaloch. Id. Dr. Lushington points out at length the difference between salvage and towage, and what he terms extraordinary towage, the latter being such as demands some extra labor. He cannot, he says, where all is fair, break in upon agreements for the latter, and allow salvage properly so called. The Harbinger, 20 Eng. Law & Eq. 641, and The Graces, 2 W. Rob. Adm. 294, were like cases, where similar terms, familiar in England, are used. In the latter, it is said, the going to the ship was a part of the services as much as the labor after arrival. And see The White Star, L. R. 1 Adm. & Ecc. 68; The Banner [Case No. 17,149]. Judge Wilkins, in this district, said, there was a lien for towage; that it might be necessary in cases of stranding. The Susan [supra], and many of the more modern American cases employ the same terms, and treat the jurisdiction, as it should be, as depending upon

a maritime service and contract only. Rightly understood, of course. no influence upon jurisdiction and remedies should be wrought by the accidental use of either class of names. The contracts and acts involved are alone material. It becomes worthy of notice here only in the supposition that analogies have been sought in the doctrines of salvage to deny a jurisdiction in rem for the violation of a familiar maritime contract, because the labor of the libellant in the accidents of its performance was not instrumental in relieving the Williams. The attempt under this contract for absolute payment by the day, irrespective of results, bears no more analogy to salvage. properly so called, than do the services of the fireman and the engineer.

It is. however, broadly contended in argument here that, irrespective of all notions peculiar to salvage, there is no hypothecation of the ship while the contract is executory. That. unless the performance is entered upon in such mode as to bring the subjects of the agreement into actual contact. there can be no remedy in rem. We were referred to no judgment or book countenancing such a doctrine beyond The Freeman, 18 How. [59 U. S.] 182, and The Yankee Blade. or Vandewater v. Mills, 19 How. [60 U. S.] 82, which, in their now expressly overruled dicta. do sustain in some degree such a doctrine in reference to contracts of affreightment. They affirmed extrajudicially that there was no lien in favor of the shipper until the cargo was laden on board. From this error it was argued that. unless the tug in this instance actually laid hold of the Williams, and made at least a single pull. she was not drawn within the jurisdiction in rem. It will be seen that even this far-fetched analogy fails not only for want of similitude, but the doctrine from which it is sought to be deduced. never had a resting place in law.

We think it may now be considered as settled that such a delivery to a carrier as imposes upon him the extraordinary liabilities attaching to his character creates a lien upon the ship to secure the performance of the contract of carriage. There is no necessity for actual contact of cargo with ship. Whether there is a remedy in rem where there has been no delivery, has not as yet been decided by the court of last resort. but in the absence of all authority to the contrary and sustained by express judgments in the district and circuit courts. and. as we said upon the argument, by what we deemed unquestionable principles, we should readily sustain a libel for the breach of a contract of affreightment wholly irrespective of delivery to the carrier. Such act may. and in most instances would. be requisite to launch the duty of carriage. But jurisdiction in rem does not depend upon it. That vests. if without it a maritime contract within the usual authority of the master has clearly

created a duty to carry, to tow, to aid in distress, or do any other act within the common duties of the department of commerce in which the vessel is engaged. If the agreements are obligatory, and the conditions for performance occur as contemplated, they do. of their own force. hypothecate the ship. The contract, the obligation which it imposes, does so.

In The Edwin [Case No. 4.300]. affirmed in 24 How. [65 U. S.] 386, was sustained a proceeding in rem for the loss of cotton upon a lighter on its way to the ship. Judge Sprague reviews the 18th and 19th Howard [59 and 60 U. S.], and anticipates what the supreme court on appeal says of the dicta in · those two judgments. He says it is worthy of much consideration whether there is not a hypothecation of the ship by a contract of carriage without any delivery to the carrier. and cites The Flash [Case No. 4,857], decided by the learned Judge Betts, of the Southern district of New York, so holding, but adds that, subsequently, in 1857, according to a newspaper report, he refused to enforce the doctrine in obedience to the dicta in 18th and 19th Howard [59 and 60 U. S.]. They out of the way, The Flash is not extinguished, although the learned judge who decided it felt himself no longer at liberty to follow its light. In The Edwin, or Bulkley v. Cotton Co., 24 How. [65 U. S.], the court say that what is said in 18th and 19th Howard [59 and 60 U. S.] and in Grant v. Norway, 2 Eng. Law & Eq. 337, all refer to circumstances where there had been no such delivery as to impose on the carrier the duty of carriage or to care for the property. It is said "the unloading of the goods at the end of the voyage, on the wharf, does not discharge the lien, and we do not see why the lien may not attach if the cargo is delivered to the master before it reaches the hold of the vessel, as consistently as its continuance after it is unloaded on the wharf or within the warehouse." The scope of what is here meant will be better understood in connection with the at one time much discussed, but now settled doctrine in all courts. English, federal and state, that a delivery at the usual place where a carrier receives goods, whether upon a wharf, in a warehouse of his own or others. fixes his liability as insurer. See Ang. Carr. §§ 129–148; 2 Redf. R. R. 55–59; Ben. Adm. § 287; 1 Conk. Adm. 193; 1 Pars. Adm. p. 183. Nowhere is any distinction made between the absolute liability of the carrier as insurer and the right to enforce it by a proceeding in rem. the abandoned dicta in 18th and 19th Howard. and the few cases dependent upon them excepted. In The Robinson [unreported], we had occasion to go somewhat into the distinction between contracts which did and those which did not bind the ship in rem. We found the line wholly drawn between those which were maritime and the undertakings of the master in reference to the sale

of the cargoes and return of proceeds, and other similar agreements collateral to his ordinary ex officio duties. We held that an agreement to collect and pay over the sum due upon a bill of goods, although contained in what was called a "collect on delivery," or a "C. O. D." bill of lading, did not authorize a proceeding in rem. But it was because it was not maritime, was an impolitic extension of the lien to cases not coming within the reason of the rule. 2 Pars. Adm. 252, cites the judgment in The Edwin to the position "that the liability to proceedings in rem commences by reception of the goods on board or at the wharf; that it continues after they are unladen." See The Tangier [Case No. 12,265]. The General Sheridan [supra] was a libel against a vessel for refusing to proceed to the ports named in a charter party. Judge Blatchford conceded that The Pacific [supra] was full authority to sustain the proceeding. It enforced a right in rem where the ship was not fitted out according to agreement, and a passenger refused to go on board, and in which Judge Nelson, sustaining a proceeding in rem, used as an illustration a refusal to carry out an executory contract to transport goods. But Judge Blatchford felt he could not follow The Pacific, as Judge Nelson had himself, in The Hermitage [supra], in obedience to the dicta in The Freeman and The Yankee Blade, announced a contrary rule. He therefore, manifestly against his own convictions and the logically sustained judgments of Judge Betts in The Flash, Judge Nelson in The Pacific, those of Judge Ware hereafter cited, and the dicta of Judge Sprague in The Edwin, dismissed the libel. But the then and now conditions of opinions in the supreme court render The General Sheridan an authority so far as the opinion of the able judge who decided it is such, for sustaining a libel against a ship for refusing to call for passengers or freight at the places and in the times where those who are authorized to make obligatory contracts agree she shall go. 1 Pars. Adm. 183, repeating the doctrine that delivery on the wharf binds the carrier, and showing in the note that he means binds the ship as well, refers to the MS. decision by Judge Betts, in which he refused to follow The Flash, and says the cases in Howard and Hennessey v. The Versailles, supra, do not compel his departure from his former ruling, and that The Edwin, 24 How. [65 U. S.] 386, sustains his own text. So far, therefore, as the decree below may be supposed to rest upon the assumption that there is no remedy in rem for the breach of a wholly executory maritime contract to carry goods, we think it fails of support.

The rectitude of the jurisdiction now taken, however, may be vindicated more fully than simply to answer the accidental objections made to it. It may be quite true that the analogies from the doctrines in salvage fail because the service is not such, and that

the breach of an executory contract of affreightment may be compensated by proceedings in rem, and still the present decree fail of affirmative support. We do not repose upon this negative argument. The wider principle, that every maritime agreement binds the ship as well as the owner, is that upon which we rest our decision. That such is the law of the American admiralty, and substantially so, as now restored, of the English, and that the ship is bound by the contract, and not by force of part performance, will be seen by the following judgment and authors. It would be a mere affectation to go back of the more modern decisions, which, if we might suppose what no one suggests, that they misconceive the older doctrines, are nevertheless in the conditions of this court to be followed. No separation of cases which announce the general rule, and those which apply it, where the services have not been rendered in, or upon, or in contact with the ship will be made. Judgment in the erroneously so-called salvage cases and towage cases, where the agreements are implied from signals and circumstances, are promiscuously referred to, as their applicability will be sufficiently apparent.

In Insurance Co. v. Dunham, 11 Wall. [78 U. S.] 1, although a proceeding in personam upon a policy of insurance, its mode of argument and approval of cases would, without more, oblige our inferior courts to say that for all purely maritime contracts there is a remedy in rem. It extensively reviews the former judgment, and sums up its able argument by the broadest announcement of the jurisdiction generally, and declares that "the only duty is to apply the general principle to the differing cases as they arise." From The Belfast, 7 Wall. [74 U. S.] 624, is quoted "that contracts, claims or services purely maritime are cognizable in the admiralty," and from Morewood v. Enequist, 23 How. [64 U. S.] 493, that part of Judge Grier's opinion which says that "over all maritime contracts there is jurisdiction in the admiralty, both in rem and in personam." New Jersey Co. v. Merchants' Bank, 6 How. [47 U. S.] 344, is referred to, and the following passage from Judge Nelson's opinion approved: "If the cause is maritime the jurisdiction is as complete over the person as over the ship. It must, in its nature be complete; it cannot be confined to one of the remedies on the contract where the contract itself is within its cognizance." In 6 How. 344, the contest was whether the proceeding must not be solely in rem, and the learned argument of counsel as well as its treatment by the court show how free from doubt is such a remedy here. We do not overlook the fact that these broad announcements are not literally and universally applicable. The exceptions, however, are so far from this case that it would be a useless criticism to suggest them. In Four Thousand Eight Hundred and Eighty-Five Bags of Linseed, 1 Black [66 U. S.] 108, Chief Justice Taney says, "As contracts

of affreightment are maritime contracts there is jurisdiction in rem." After the decision in 6 How., this was not doubtful, but it is now referred to for the reason and ground of the proceeding. It is the contract which gives it, not a service or act in a locus within the territorial jurisdiction of the admiralty, as is necessary to give cognizance of a tort. Among the leading and learned judgments upon this subject, are those of Judge Ware. They have been repeatedly approved by the supreme court. In The Paragon [supra] he says: "Every contract of the master, within the scope of his authority, binds the vessel and gives the creditor a lien for security;" and in The Phebe [Case No. 11,066], in an instructive opinion, the lien is asserted and traced to the maritime law, and its original reason thought to be found in that feature which confined the owner's liability to the value of the ship. But another and leading one, undoubtedly, is the fugitive character of the property and agents, and the almost universal absence of the obligated persons and the impracticability and expense of seeking them. The Robert J. Mercer [Id. 11,891], in deciding that a Massachusetts statute created no lien for refusing pilotage where it gave half fees, states, as a reason, "that there was neither any actual service or contract for service made." That had there been a contract, express or implied, a lien would have resulted, is decided in The America [supra]. The law was amended so as to give a lien, and the objection was made that to enforce such a statutory right where there was no actual service to the ship there was no jurisdiction in the admiralty. Judge Lowell, after arguing that from such a law a contract would be raised by implication, says, "a lien is implied from a contract of pilotage, unless the statute expressly, or by implication, forbids it." If there is a contract for service, and it is refused where labor has been expended to tender it, that a proceeding in rem is given, is assumed as undoubted law. Benedict, Conkling, Abbott, and Parsons, citing portions of the foregoing and following decisions, all so lay down the rule. The latter (1 Adm. 173) says: "Every contract by the master within the scope of his authority binds the ship to its fulfillment." In The Bold Buccleugh, 3 W. Rob. Adm. 222, Dr. Lushington quotes and approves what he says in The Druid, 1 W. Rob. Adm. 391. After saying that generally no suit could be maintained against the ship, unless, at the time of the contract or occurrence, owners were also responsible, he adds (page 399): "The liability of the ship and the responsibility of the owner in such cases are convertible terms. The ship is not liable if the owners are not responsible, and no responsibility can attach upon the owners if the ship is exempt and not liable to be proceeded against."  This was said originally in a case for a willful wrong by a master where the owners were not liable and the ship discharged. But it was quoted in The Bold Buccleugh as applicable to that class of contracts for which the master as such may bind his owners. We quote the passage as it stands,

and concede it is true so far only as it asserts that where the master has a right by the maritime law to bind the owners, he may by his contracts hypothecate the ship. Here in the case of domestic vessels, as the law just now stands, there is an exception as to supplies. But all concede it to be an anomaly in view of the sources from which our admiralty must draw the larger portion of its powers. It does not affect the general rule upon which we rely. In The Susan, Judge Sprague says, that if a signal is given, and persons go out to render assistance with great pains to the ship, their services cannot be rejected as unnecessary, and that if the ship comes to a place of safety without their aid, a remedy in rem should be given. He concedes that if the agreement is for absolute payment this will displace the salvage compensation, but it is clear he would still afford the remedy in rem. If the implied contract to accept services deduced from a signal will sustain the lien, surely the formal one in this case will. The Undaunted, Lush. 90, is a case where at request of a ship a tug went for two anchors, but before they arrived the ship was gone. A libel in rem was sustained. After pointing out the difference between the cases of pure salvage, where volunteers labor in the expectation of large rewards and run the risk of success, it is said, "But if men are engaged by a ship in distress, whether generally or particularly, they are to be paid according to their efforts, even though the labor may not prove beneficial to the vessel." Here was a contract. Before the instrumentalities for assistance reached the ship she had gone. The case is that before the court. In The Circassian [Case No. 2,722], a libel was sustained for unloading a ship on fire. The cases which deny the jurisdiction in favor of stevedores are justly disapproved, but the case is distinguished from them. It rests upon the principle announced in 11 Wall., that where the contract was decided to be maritime, it was a duty to take jurisdiction, and that all the remedies were open both in personam and in rem. Benedict's Admiralty Practice says, stevedores may sue in rem, and we think he is right. The Ocean, 2 W. Rob. Adm. 92. By request, the libellants took a message for a steamer. They did personally board The Ocean to receive it, but this fact is noticed in judgment only to enhance the compensation, as it was hazardous. It is another case of remedy in rem for services not upon or in contact with the ship, and one which for recompense did not depend upon the salvation of the vessel. The Canada [supra]. It is manifestly assumed in the judgment that simply lying by or consorting with another ship, if by contract, will sustain the libel. The Underwriter [supra]. Judge Nelson allowed The Delaware, in a proceeding in rem, a large extra compensation for lying by, although she could not reach or in any way aid The Underwriter. It was, however, upon request. There was a contract. Such feature, it will be seen, attends all the cases where allowances have been made where no actual benefit has ac-

crued or labor upon the vessel has been done. There are a few instances where, in the encouragement of diligence, the expenses of volunteers have been paid by proceedings in rem, where unexpectedly aid becomes necessary or the attempt abortive. See, fully so deciding, The Ranger, 9 Jur. 119; 2 Pars. Adm. 284; The Albion, 3 Hagg. Adm. 254. Even the old time-honored maxim that "salvage never results from an attempt, but from rescue only," is no longer a universality. If Providence does what the fearless and active salvor attempted, the rule has been modified. It is only where the calamity destroys the object of the effort that all remedy is denied. We look in vain into any department of the rational and protective maritime code for a principle or a precedent which will deny a remedy to the owner, who in good faith and in reliance upon formal contracts incurs expense in order to tender the labor he has agreed to perform.

This jurisdiction is all the more necessary now that so large a portion of our transportation is done by corporations whose ships are frequently covered by bonds and mortgages, and whose personal responsibility is doubtful. To send the proposed shipper in all instances to the often distant home of the owner is a hardship which the rule was established to prevent, and which no evil growing out of its administration demands. No class of contracts requires promptness so much as those connected with commerce. The buyers of produce, the merchant and manufacturer all have adjusted their most continuous and common transactions upon a basis which involves the utmost fidelity and regularity in the carrying trade. The proprietor of a tug, which in virtue of a fair contract is sent hundreds of miles to aid a ship in distress, should not be compelled to go to another state and sue without security for the agreed price, because the accidents of the winds and waves may have rendered its labors unnecessary. Decree for libellant.